UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREW PASHMAN,

        Plaintiff(s),

    v.

AETNA INSURANCE CO,

        Defendant(s).

_____/

No. C-13-02835 DMR

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
[DOCKET NO. 27]**

Before the court is a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed by Defendants Aetna Insurance Company of Connecticut ("Aetna") and Medicity,[1] Inc. ("Medicity").  [Docket No. 27.]  The court conducted a hearing on the motion on June 26, 2014.  For the reasons stated below, the motion is **granted**.

## I.  FACTS

This action is a dispute between Plaintiff Andrew Pashman and Defendants, his former employer.  Plaintiff alleges seven causes of action against Defendants: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) failure to pay wages due in violation of California Labor Code § 200 *et. seq*; (4) violation of California Labor Code § 232; (5) wrongful termination in violation of public policy; (6) libel; and (7) slander.  All claims are brought against both Medicity and Aetna.

**A.    Background**

Medicity offers health and related technology services to providers, payers, employers, and consumers.  Plaintiff was hired by Medicity in March 2010 as a Regional Vice President of Sales.

---

[1]  At all relevant times, Medicity was a subsidiary of Aetna.

His job duties were to sell Medicity software and services to hospitals and health systems.  Plaintiff signed an acknowledgment stating that "Employment by the Company is 'at-will,' not for a definite term, and may be terminated by the Company at any time, for any reason."  Plaintiff does not dispute that he was an at-will employee.  *See* Cal. Labor Code § 2922 ("An employment, having no specified term, may be terminated at the will of either party on notice to the other.").

In June 2010, Medicity promoted Plaintiff to Enterprise Area Vice President, which included the duties of managing three Regional Vice Presidents of Sales.  On May 11, 2012, Plaintiff transferred back to Regional Vice President of Sales and ceased all management duties on that date.  During the relevant period, Plaintiff was supervised by Greg Miller, Medicity's Senior Vice President of Sales and Marketing.  Plaintiff was also supervised by Patricia Hayward after she was hired by Medicity in mid-August 2012.

Medicity terminated Plaintiff's employment on October 2, 2012.

**B.      Plaintiff's Commission Plans**

In 2012, the time period relevant to this lawsuit, Plaintiff's sales commissions were governed by two different plans.  On February 1, 2012, Plaintiff signed the "FY 2012 Enterprise Area VP Commission Plan" ("EAVP Plan").  The EAVP Plan governed Plaintiff's commissions up to May 11, 2012.  Under the EAVP Plan, Plaintiff was eligible for commissions on personal sales and lesser commissions on sales generated by those reporting to him.  The EAVP Plan includes the following terms:

> All commission payments require the EAVP to be employed by Medicity at the time the payment is due . . . . Commissions will be paid as Medicity receives any payment for software or services . . . .

After May 11, 2012, when Plaintiff transitioned back to a Regional Vice President role, Plaintiff's commissions were governed by the "Enterprise Regional Vice President plan" ("ERVP Plan").  Under the ERVP Plan, Plaintiff was eligible for commissions on his personal sales only. The ERVP Plan includes the same provision as the one quoted above from the EAVP:

> All commission payments require the ERVP to be employed by Medicity at the time the payment is due . . . . Commissions will be paid as Medicity receives any payment for software or services . . . .

2

The EAVP and ERVP Plans are the only contracts at issue in this lawsuit.  For purposes of this motion, it is undisputed that both plans are enforceable contracts between Plaintiff and Defendants.

**C.    Chronology of Relevant Events**

**1.  May–August 2012 Communications Regarding Commission for Banner Health Deal**

During his employment with Medicity, Plaintiff worked on a transaction with Banner Health that involved multiple entities affiliated with Aetna contracting to provide services and software to the client.  Medicity signed a contract with Banner Health on May 9 or 10, 2012.  The Banner Health contract was a "shared savings" deal, meaning that rather than receiving direct up-front payments from Banner Health, Medicity's potential share of the revenue would be paid out as a percentage of the shared savings, if any, that Banner Health realized by using the technology provided by Medicity.

On June 15, 2012, Plaintiff sent an email to Miller regarding commissions from the Banner Health deal for himself and his sales representative.  Plaintiff noted, "You indicated that [the Banner Health deal] still has not been valued and would look into this early next week."  Peters Decl. Ex. RR.

On July 10, 2012, Plaintiff and Miller had a telephone call regarding the Banner Health commissions, during which Miller informed Plaintiff he was not ready to have the substantive discussion.  Miller also raised a question about Plaintiff's eligibility for the commission.  Also on July 10, 2012, Brent Dover, the division president, emailed Aetna Human Resources specialist Caroline Wilke, likely referring to Plaintiff when stating that he had "decided to move against the topic of our call today.  I need to engage your team to initiate the process of removal of the employee.  I understand this might be a long process, but I want to get started."  That same day, Miller forwarded himself emails regarding Plaintiff dating from 2010 to 2012.

On July 11, 2012, Plaintiff sent an email to Miller noting that the Banner Heath deal had been signed on May 9, 2012, that Plaintiff had transitioned out of his manager role on May 11, 2012, and that Plaintiff believed he had a "right to be paid the manager's commission on the Banner deal .

. . ."  Peters Decl. Ex. M.  Plaintiff also stated, "I am sorry that you felt I was 'interrogating you' by asking about my commission.  I think it is completely fair and reasonable to inquire about when and how my commission will be paid on deals."  *Id.*

On July 12, 2012, Miller sent an email to Plaintiff stating that Miller was again not ready to discuss Plaintiff's commission for the Banner Health deal because Medicity did not know how it would be paid for the Banner deal yet, "given the unique shared savings model [] that puts any revenue potential out 2 years from now."  JSUMF 36; Peters Decl. Ex. W.  Miller noted that commissions might not be paid at all.  Peters Decl. Ex. W ("[I]f we don't hit the savings goal, there's nada for any of us.").  Miller also stated, "And, as per the comp plan, we don't pay commissions until we get cash.  And if we aren't going to get cash for 2 years, then we can't pay commissions until then anyway . . . ."  *Id.*  Miller also noted that "[p]er the commission plan, to get paid commissions, Salesforce.com[2] has to be up to date at all times," but that Plaintiff's Salesforce.com entries were not up to date and were missing key information, and that Plaintiff was not following the "Storyleaders" methodology for recording his work.  *Id.  See also* Keane Decl. Ex. I (EAVP Plan) at D000024 ("[T]o be eligible for commission payment, every opportunity must be up to date and accurate in Salesforce.com and the Storyleaders methodology is followed for every opportunity."); Ex. J (ERVP Plan) at D000034 (same).

On July 16, 2012, Plaintiff spoke with Dover by phone regarding Plaintiff's commission for the Banner Health deal.  Dover told Plaintiff that Dover would look into it, but that Plaintiff needed to "stop talking about a lawsuit against the company," to which Plaintiff replied he had never mentioned the subject to either Dover or Miller, but acknowledged there had been talk of the subject among the sales team.

On July 31, 2012 and August 1, 2012, Plaintiff and Dover communicated via email about Plaintiff's commission for the Banner Health deal.  Dover told Plaintiff that Miller would speak to Plaintiff about the Banner commission later that week and had "good news on this topic."  Peters

---

[2] SalesForce.com appears to be the reporting system used by Medicity employees to document progress on their work with prospective or active clients.

Decl. Ex. AA.  On or about August 2, 2012, Miller called Plaintiff and told him he would be getting paid on the Banner deal.

On August 14, 2012, Plaintiff sent an email to Miller and Andrew Fullmer, a controller who handled commissions for Medicity, stating that Plaintiff was sending "the subject form for the Banner Health commission for your approval even though the deal has not been value[d] [] yet . . . . I would like to have this recorded on my commission statement as a payable even if the deal value is a TBD."  Peters Decl. Ex. EE.  Miller responded to both Plaintiff and Fullmer stating: "[Plaintiff] is correct.  He should be paid on Banner as the Manager . . . . Whenever we figure out the deal value (what we are getting paid from ACS[3]), we'll need to work into the commission process."  Peters Decl. Ex. EE.

**2.  August–September 2012: Conflicts With Patricia Hayward**

Patricia Hayward became Plaintiff's supervisor when she was hired by Medicity in mid-August 2012.  Hayward testified that during one of their first interactions, Plaintiff told Hayward, "I don't really need a manager" and "I don't expect to be micromanaged."  Keane Decl. Ex. D (Hayward Dep.) at 25:5-26:5 (Hayward testifying that Plaintiff's "attitude was, 'I don't need you or want you here'").

On September 5, 2012, Hayward, Miller, Plaintiff and others held a telephonic brainstorming session.  After the call ended, Plaintiff called Hayward.  Hayward expected a debrief conversation about the brainstorm session.  Instead, Hayward testified that Plaintiff was "venting some incredibly pent-up frustrations at Medicity."  Hayward Dep. at 125:9-14.

Hayward testified that Plaintiff was "shouting and screaming" at her for ten to fifteen minutes, saying, "You are not going to micromanage me, I am not going to deal with this, this is just a horrible way to treat people."  Hayward Dep. at 120:21-22, 121:6-8, 122:4-5.  Hayward told Plaintiff several times that she was uncomfortable with the way that Plaintiff was speaking to her, and asked him several times "take [it] down a few notches," but that Plaintiff continued to shout at

_____

[3]  ACS was the contracting entity for Banner Health.

her.  Hayward Dep. 121:10-11, 123:23-25.  Hayward testified that by the time the call was finished,

she was "shaking because it was so ridiculously over the top" and that she felt like Plaintiff "was

going to go postal; he was that angry and upset and shouting to that kind of volume and with that

sort of ferocity."  Hayward Dep. at 122:5-6, 124:14-16.

On the next day, September 6, 2012, Hayward called Miller and told him what had happened.

Hayward Dep. at 122:23-24.  Hayward told Miller that she "[had] never been spoken to like this,

either personally or professional" and that one "should never speak to another human being like that,

let alone your boss."  Hayward Dep. 122:24-123:5.  Miller suggested that Hayward send Plaintiff an

email, which Hayward did on the same day.  The email stated, in part:

> I wanted to follow up to our call yesterday after the strategy session because I'm feeling
> uncomfortable with our interaction and want to make sure you and I start our working
> relationship "on the right foot."
>
> Having been in your shoes as a territory representative before, I understand the pressures and
> anxiety, especially when there is a deal so close to winning, only to have it get sideways at
> the 11th hour—it's frustrating for sure . . . . I hope you can understand the pressures that I am
> under too.  Personally, I hold myself very accountable for our performance as a team and can
> only expect the same from each team member.
>
> . . . . From our conversation yesterday, it feels like you believe you were being micro-
> managed, but I assure you that was not the purpose or intent.  The objective of the call was
> simply to discuss various strategies amongst several people with different points of view . . .
> . Taking things said with positive intent is extremely important to these situations, our
> culture and work environment.
>
> . . . . Our call yesterday after the strategy call made me very uncomfortable and it wasn't in
> line with those values.  I was especially uncomfortable with your confrontational attitude and
> the volume of the discussion.  I don't know if you are feeling specific or excessive pressures
> or anxieties—personally or professionally—but it is never appropriate in a workplace
> environment to take the tone you did, with me as your manager or with any other
> Aetna/Medicity colleague.  I encourage you to vet concerns with me in a productive and
> positive manner where we can work together to find solutions to issues that arise.  I don't
> mean to suggest that we always have to agree, but we need to be able to handle
> disagreements and issues constructively, openly and honestly.

Keane Decl. Ex. E.

On September 10, 2012, Plaintiff responded to Hayward's email.  Plaintiff stated, "[F]rankly,

I am confused over a number of your comments.  Specifically, I would like to better understand

what you are feeling uncomfortable about relative to our discussion and also what you feel is not

compatible with Aetna values.  I am also confused by your description of 'aggressive approach'

6

during our call with my suggestion on how to reconcile our differences . . . ."  Keane Decl. Ex. L at D000394.  Plaintiff stated that he was "surprised [to] see an e-mail from [Hayward] outlining such concerns when they did not seem apparent in the actual discussion."  *Id.  See also* Hayward Dep. 123:18-19 (Hayward testifying that Plaintiff's response was "I have no idea what you are talking about.  I thought yesterday's call was great").  Hayward testified that this response led her "to realize that [Plaintiff] had no intention of being honest, because there is no possible way he couldn't understand what had happened yesterday, especially when I told him no less than three times to just tone it down."  Hayward Dep. at 123:20-24.

Hayward also received complaints from clients about Plaintiff.  According to Hayward, in late September 2012, Hayward received a call from a client who was upset and felt that Plaintiff was holding up a deal to structure it in a way so that he would get paid commissions.  On September 21, 2012, Hayward sent an email to Miller regarding a transaction with Providence Oregon stating, "Apparently Andrew has given the customer knowledge of HIS issues around compensation tied to milestones and payments within contracts.  Her feeling is he has held up this SOW [Statement of Work] because he is afraid of how he will get paid."  Keane Decl. Ex. S (emphasis in original).  Hayward also told Miller that the client "is very afraid that anytime we do any sort of upgrade additional contracting with us, he will drag out negotiations so that he will get paid appropriately.  I don't know about you but a customer should NEVER have that feeling.  I don't mind a little 'hey can you will do [sic] me a big favor' type discussions so we get payment terms set in our favor but we should never ever hold up contracts for commission reasons."  *Id.* (emphasis in original).  On September 22, 2012, Hayward sent an email to the client apologizing for Plaintiff's behavior.  Keane Decl. Ex. L at D000395 ("I am really embarrassed for Medicity because of the comments [Plaintiff] made about his commission payments relative to the SOW.  I am very sorry if he made you feel responsible for his income in any way, or you felt like he purposely delayed the SOW, but most importantly, for making this process uncomfortable for you or anyone else within your team organization.").

Hayward testified that she had received a customer complaint and had been told that Plaintiff

7

1   had disclosed some details of the Medicity compensation plan to a customer; Hayward reported this

2   allegation to Human Resources.  It is not clear from the record whether Hayward was referring to

3   the same events she discussed in her September 21, 2012 email to Miller or a different event.

### 3. September–October 2012: Investigation Into Plaintiff

5   On September 6, 2012, Miller sent Hayward an email stating: "I am going to talk with a

6   senior Aetna HR person about how to move on Andrew now and circumvent the Aetna process. I

7   think it's time for him to leave and Brent [Dover] does too."  Peters Decl. Ex. DD.

8   Plaintiff was on vacation from September 18 to 29, 2012.  During that time, on September

9   27, 2012, Aetna opened an investigation into Plaintiff's conduct as an employee.  The investigator in

10  charge was Peter Getz.  On September 27, 2012, Getz interviewed Miller as well as Hayward, and

11  Miller forwarded emails regarding Plaintiff to Getz.

12  On the same day, Miller sent an email to Getz summarizing some of his concerns about

13  Plaintiff.  The email states in its entirety:

14  Hi Peter – here is a quick synopsis of things with Andrew Pashman:

15  • He has been here for a little over 2 years

16  • Throughout that time, he has had numerous HR violations – inappropriate comments,
    behavior, etc. He has had multiple conversations with me and Medicity HR about these
17  events. I sent you some of the emails that relate to his actions and behavior

18  • About a year ago, he insulted an executive at a prospective customer (Schumacher Group)
    and the executive asked that Andrew not return to the account. We have yet to close this deal
19  due to the damage it cause. [sic]

20  • About 2 months ago, he was calling other members of our sales team, trying to rally
    support to file a class action lawsuit against Medicity related to commission payments
21

22  • Patty Hayward joined us 1 month ago. In his first call with Patty, he told her how he was
    going to be managed

23  • In his second call with Patty, he verbally screamed at her (I forgot to mention that I had a
    call with Andrew back in May where he verbally screamed at me and used excessive
24  profanity ("F-bombs" directed at me and others)

25  • Last week, 2 separate prospective customers complained about Andrew. The first,
    Providence Health System in Oregon, talked to Patty about how Andrew told them that he
26  needed to structure the payment terms in a way to ensure he gets paid his commissions faster.
    This Providence Oregon was very offended and asked that Andrew not be on the account.
27

28

8

• The second event last week was with Providence Health System in Southern CA (a sister organization to the Oregon Providence, but a completely separate situation). "Kim" at Providence told Patty how Andrew was rude and condescending to their team and was appalled by his behavior. They asked that he not be on the account.

There are obviously a ton of details in between, but I hope you get the gist…

Let me know how else I can help.

Keane Decl. Ex. R.

By September 28, 2012, Miller and others at Medicity had formulated a procedure for terminating Plaintiff: he would be interviewed by Getz "first thing Monday morning and [Getz] feels he will be able to get Andrew to trip himself up," after which Plaintiff would be told he was on administrative leave; Getz would have access to Plaintiff's email to "try[] to find anything related to the issues"; and on Tuesday morning, Miller would call Plaintiff to terminate him.  Peters Decl. Exs. FF, GG.

Getz proceeded as planned.  Early on Monday, October 1, 2012, Getz interviewed Plaintiff by phone for approximately 30–35 minutes.  Getz and Plaintiff spoke about several incidents during Plaintiff's employment, including one in which Plaintiff referred to an Aetna employee as a "man servant," and another where he made a comment about "coconut bras and grass skirts" during a sales call with fifty attendees, apparently after a meeting in Hawaii.

At the conclusion of the interview, Getz informed Plaintiff he was on paid administrative leave while the investigation was being conducted, that the results of Getz' investigation would be presented to an employment lawyer at Aetna, and the outcome could result in a number of things including a warning letter, suspension or up to termination.  Plaintiff told Getz about David Duntz, a Medicity management employee who might be able to rebut Miller's allegations of Plaintiff's conduct; Getz called Duntz two or three times but never spoke with him.  Getz also invited Plaintiff to provide him with a written statement later that day; Plaintiff emailed Getz early the next day (October 2, 2012) informing Getz that Plaintiff intended to provide a written statement.  Apparently Plaintiff never provided Getz this written statement, because Plaintiff was notified of his termination two hours later.

9

**4.  October 2, 2012: Termination and Plaintiff's Response**

Miller and Plaintiff had scheduled a conference call for 9 a.m. PST on October 2, 2012, which Plaintiff did not attend.  Miller called Plaintiff's cell phone and home phone, and left a voicemail on the latter stating that Miller would be sending a letter to Plaintiff's personal email address.

Miller sent the letter as promised to Plaintiff's personal email address at 9:33 a.m.  The termination letter had the subject line, "Termination for performance and inappropriate behavior." Keane Decl. Ex. O (Termination letter).  It stated that Plaintiff was being terminated for "unsatisfactory performance and inappropriate behaviors, which includes your rude and condensing [sic] tone when speaking to internal and external customers, requests from several prospective customers to not have you involved in their account, using a loud tone when speaking to your manager, being disrespectful to your managers and colleagues, telling your direct manager how you were going to be managed and your excessive use of profanity."  Keane Decl. Ex. O.  Miller noted, "More recently, it was brought to our attention [that] you had a discussion about your commissions with a prospective customer and needed to structure the payment terms in a way to ensure you get paid your commissions faster.  We received feedback from another customer how you were rude and condensing [sic] to their team and asked you not to be on the account."  *Id.*

Later that day, Plaintiff responded to his termination letter by sending Miller an email stating that the explanation given to him in the letter was "inconsistent with reality."  Keane Decl. Ex. P. Plaintiff also stated that "[Getz] was very, very clear in . . . his questions about whether or not I was planning a class action lawsuit.  Perhaps I was stupid to confirm to him that there had been discussion among the sales reps and others concerning commission payments and suing the company, but there it is."  *Id.*  Plaintiff also stated, "Given all these facts and inconsistencies it is painfully obvious that my termination is based on a 'concern' about me possibly taking action regarding commissions."  *Id.*

Getz's investigation continued even after Plaintiff was terminated.  Getz interviewed Paula Jones on October 3, 2012, regarding some of the allegations being investigated by Getz.  Getz closed

10

1  the investigation on October 3, 2012.

2  **D.      Status of Deals At Plaintiff's Termination**

3          At the time of Plaintiff's termination, he was apparently involved in several transactions.

4  The evidence in the record regarding these deals is sparse.  It is undisputed that the Hawaii Pacific

5  deal had not closed.  Nor had the Providence SoCal deal, in part because not all of the information

6  requested by the client had been provided.

7          As mentioned above, the Banner Health deal was signed on May 9 or 10, 2012, and it was a

8  "shared savings" arrangement in which Medicity would be paid a percentage of the shared savings,

9  if any, that the client realized by using the technology, rather than via direct up-front payments.

10  Plaintiff testified that Miller told him the commissionable amount on the Banner Health deal would

11  be calculated on book value for the products and services sold.  However, nothing in the EAVP Plan

12  plan states that a "shared savings deal" would be valued based on "book value," and there is no

13  evidence that Medicity ever calculated a "book value" for the Banner Health contract.  Sometimes

14  the pricing for deals would change during the course of ongoing negotiations.  Such was the case

15  with the Banner Health deal.  Approximately one year after Plaintiff's termination, Medicity entered

16  into a fixed fee agreement with ACS for the services it would provide to Banner, so that payment

17  was no longer based on a shared savings model.

18  **E.      Plaintiff's Retention of Medicity Equipment and Documents**

19          Plaintiff signed a Nondisclosure Agreement of Invention, Noncompetition and

20  Nonsolicitation Agreement when he began his employment with Medicity.  Paragraph 1.b. of the

21  Agreement required him at the time of termination to "immediately deliver to the Company all

22  documents, records, writing, specifications, programs or other materials of any kind, including

23  copies, which are in my possession or control and which contain any Confidential Information."

24  Keane Decl. Ex. H.

25          In the October 2, 2012 termination letter, Medicity directed Plaintiff to return all Medicity

26  equipment, including his laptop, immediately to the company's office in Salt Lake City, Utah.

27  Three weeks later, on October 23, 2012, Medicity received Plaintiff's Medicity equipment,

28                                                        11

including a laptop and USB card.  Plaintiff also had a backup drive that he had used during his employment with Medicity, which contained his expense reports, holiday schedules, account information, presentations, marketing materials, benefit information, and information on actual or potential Medicity customers on whom he was working at the time.  Plaintiff deleted this backup drive approximately one week after his termination.

After his termination, Plaintiff did not return the Medicity documents he had printed or the Medicity documents that he maintained on a hard drive and later deleted.  Plaintiff produced documents in the current litigation regarding deals with Providence Oregon, Providence SoCal, Hawaii Pacific Health, St Joseph's Health System, and Mercy Health.  Plaintiff did not notify Medicity that he had retained the Medicity documents that he produced in the present litigation.

Plaintiff also retained a Medicity powerpoint presentation on the topic of sales stages.  The word "Medicity" appears on three slides.  After Plaintiff's termination, he distributed this presentation to four or five employees in the sales team of his new employer, Citi.  The powerpoint presentation outlined the sales stages as described by author Jeff Thull in his published and publicly available book: "Mastering the Complex Sale."  Plaintiff testified that his reason for showing the presentation to his colleagues at Citi was to "giv[e] them an idea of how Jeff Thull represents or has defined the basic five sales stages, so to give them some idea of the concept short of reading Jeff Thull's book."  Keane Decl. Ex. B (Pashman Dep.) at 133:20-25.

After Defendants' counsel contacted Plaintiff's counsel in January 2014 about Plaintiff's use of the powerpoint presentation, Plaintiff deleted all documents on his personal computer that related to the time period of his employment with Medicity.

**F.      Statements Made by Medicity After Plaintiff's Termination**

On October 2, 2012, Miller sent an email to sixteen Medicity employees stating: "Andrew Pashman is no longer with Medicity.  Please do not contact or speak with Andrew about anything related to Medicity, Aetna or EB.  If you were working with Andrew on anything in particular, please reach out to Patty Hayward or me."  Plaintiff has no evidence that this email was published to anyone who was not a Medicity employee.

On November 5, 2012, Miller sent an email to 25 Medicity employees in the sales, sales support, and marketing departments within Medicity, stating: "Team, I have reason to believe that our sales pipeline[4] and forecast may have been sent to someone at Certify Data Systems.  Under the concept of 'only the paranoid survive,' please be aware of this.  Also, if you do find that Certify is suddenly showing up in a deal where they weren't before, please let me know ASAP."  Peters Decl. Ex. MM.

Also on November 5, 2012, Miller sent an email to two Medicity management employees:

> I got some info over the weekend that leads me to believe that Pashman shared our pipeline with a former Medicity employee who we fired 2 1/2 years ago, Dawn Bowes, that now works for Certify.  And now with Certify showing up in Providence So. CA and Now Prov Oregon, I think m [sic] gut is right...I only have circumstantial evidence, but I have a very plausible scenario for how this might have occurred.  Dawn and Andrew have very similar personalities and issues.

Keane Decl. Ex. W.  Plaintiff has no evidence that this email was published to anyone who was not a Medicity employee.

Shortly after sending the above email, Miller sent an email to two Aetna Human Resources employees stating in its entirety:

> I received some information over the weekend that leads me to believe that Andrew Pashman may have shared our pipeline/forecast with a salesperson at Certify Data Systems, which is a competitor of Medicity.  This person at Certify worked in sales at Medicity, but she was terminated 2 1/2 years ago.  The information I heard over the weekend was essentially that she is going to harm Medicity.  The Certify person and Andrew have very similar (vindictive) personalities.

> This morning, I learned that Certify Data Systems is involved in 2 significant sales opportunities, both of which were the 2 accounts where Andrew Pashman was previously involved and coincidentally, were the 2 accounts most recently asked that Andrew be removed from their account (Providence Oregon and Providen So. CA).  Certify was in no way involved in either of these deals until last week.

> My evidence is circumstantial and gut feel at this point.  I wanted to make you aware of this, however, just in case we might want to remind Andrew about how any Medicity/Aetna information is confidential.

Keane Decl. Ex. T.  Plaintiff has no evidence that this email was published to anyone who was not a

---

[4]  The First Amended Complaint ("FAC") defines a "sales pipeline" as "essentially a list of prospects."  FAC [Docket No. 6] at ¶ 57.

Medicity employee.  Miller forwarded this email to Getz and stated, "I wanted to make you aware of this situation as well.  I don't know if you have any special tricks to figure out if Pashman leaked this information..."  Peters Decl. Ex. NN.

Miller testified that his belief that Plaintiff had shared the Medicity pipeline/forecast with a competitor was based in part on a statement allegedly made by Dawn Bowes to Miller's ex-wife at a dinner.  Bowes told Miller's ex-wife that she was "going to cause some serious harm to Medicity."  Peters Decl. Ex. B (Miller Dep.) at 86:10-14; 88:4-22.  Shortly after Miller's ex-wife told Miller she had heard the comment from Bowes, Bowes allegedly showed up for the first time at two accounts that Medicity had been pursuing.  Miller did not contact Dawn Bowes about her remark regarding harming Medicity.

Hayward testified that Miller "intimated" to her that he believed Plaintiff had given the Medicity sales pipeline to a competitor because the competitor was showing up in a deal when it had previously not been there.

According to Steve House, a Medicity employee, in October or November 2012, Miller stated on a sales call with Medicity salespeople that after "he was terminated[,] Andrew Pashman had taken Medicity's sales pipeline and given it to a competitor."  Peters Decl. Ex. QQ (House Declaration).

On November 15, 2012, Plaintiff received a text message from Doug Arent[5] saying Miller "has everyone convinced that you stole the listing gave it to the other vendor. Had lunch with Bryant yesterday and he Seem convinced. [sic]  Bill and I had to explain to him why it wasn't you."  Peters Decl. Ex. PP.

## II.  LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*

---

[5]  The parties do not explain who Doug Arent is or his relationship with the parties.

14

1   *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light

2   most favorable to the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

3   (citation omitted).  A genuine factual issue exists if, taking into account the burdens of production

4   and proof that would be required at trial, sufficient evidence favors the non-movant such that a

5   reasonable jury could return a verdict in that party's favor.  *Id.* at 248.  The court may not weigh the

6   evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.  Conclusory

7   statements without factual support are insufficient to defeat a motion for summary judgment.

8   *Surrell v. Cal. Water Serv. Co.,* 518 F.3d 1097, 1103 (9th Cir. 2008).

9         To defeat summary judgment once the moving part has met its burden, the nonmoving party

10   may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit

11   or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine

12   issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

13   (9th Cir. 1987).  In other words, there must exist more than "a scintilla of evidence" to support the

14   non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.  *See*

15   *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "[w]hen opposing

16   parties tell two different stories, one of which is blatantly contradicted by the record, so that no

17   reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on

18   the motion.  *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

19   **III. DISCUSSION**

20         Defendants move for summary judgment on all seven claims pleaded by Plaintiff in the First

21   Amended Complaint.  The court notes that it has diversity jurisdiction over this case.  Both sides

22   analyze the issues in this motion under California law.  The court agrees that the substantive law of

23   California governs.  *Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983) ("In diversity cases,

24   the district court normally applies the substantive law of the forum state . . . .").

25   **A. Breach of Contract**

26         The FAC alleges that "Defendant[s] breached the written and signed [EAVP] Plan, by

27   refusing to pay the commissions owed to [Plaintiff] pursuant to that agreement."  FAC at ¶ 34.  The

28   15

FAC does not allege the specific deals for which Plaintiff had not been paid.  The only two deals mentioned in the FAC are the Banner Health deal and a deal with Hawaii Pacific Health.  FAC at ¶¶ 15, 18, 22, 23, 25, 27.  Plaintiff now claims he was owed unpaid commissions on the following deals: (1) Banner Health, (2) Providence Oregon, (3) Providence SoCal, (4) Exempla, (5) Christus, and (6) Texas Health Resources.

### 1. Express Terms

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . . ."  Cal Civ. Code § 1636; *Ben-Zvi v. Edmar Co.*, 40 Cal.App.4th 468, 473 (1995).  "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible."  Cal. Civ. Code § 1639.  "We may not create for the parties a contract which they did not make, and cannot insert in the contract language which one of the parties now wishes were there."  *Ben-Zvi*, 40 Cal.App.4th at 473 (quotation and ellipsis omitted).  "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  Cal. Civ. Code § 1638.  "The words of a contract are to be understood in their ordinary and popular sense."  *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal.App.4th 944, 955 (2003).

The text of the EAVP Plan is clear that commissions will be paid when Medicity receives payment.  EAVP Plan at D000024 ("Commissions will be paid as Medicity receives any payment for software or services . . . .").  The text is also clear that only individuals employed by Medicity at the time payment is due may receive commissions.  *Id.* ("All commission payments require the EAVP to be employed by Medicity at the time the payment is due . . . .").  Plaintiff acknowledged at his deposition that his understanding of the EAVP Plan was that "as the commission plan states, I don't get paid until the customer starts paying . . . us money."  Thus, it is undisputed that under the express terms of the EAVP Plan, Plaintiff was only owed commissions on deals which resulted in payments to Medicity while Plaintiff was still employed by Medicity.

The record is bare with respect to five of the six deals for which Plaintiff claims he was not paid commissions owed.  It is undisputed that the Providence SoCal deal had not closed by the time

of Plaintiff's termination.  Plaintiff points the court to no evidence regarding whether the Providence Oregon, Exempla, Christus, and Texas Health Resources deals existed, let alone closed or resulted in payments to Medicity during Plaintiff's employment.[6]  Plaintiff asserts that he has "alleged and presented facts supporting his claim he is owed commissions on . . . client matters," *see* Opp. at 24, but none of the cited evidence remotely supports his claim.[7]  In the absence of evidence, a reasonable jury cannot conclude that Plaintiff was owed commissions for the Providence SoCal, Providence Oregon, Exempla, Christus, and Texas Health Resources deals.

Regarding the sixth client, it is undisputed that the Banner Health deal closed prior to Plaintiff's termination.  However, the undisputed facts also show that, at the time of Plaintiff's termination, the deal was structured in such a way that Medicity would only receive payment as a percentage of the savings that Banner Health would eventually realize from the Medicity products, if any.  Plaintiff points to no evidence that Banner Health made any payments to Medicity when the deal was structured under this "shared savings" model.[8]  At the hearing, Plaintiff's counsel repeatedly conceded that Plaintiff had not earned the Banner Health commission as of the date of his termination.  Thus, under the express terms of the EAVP Plan, Plaintiff was owed no commission for this deal.

---

[6] After the court held a hearing on the motion, Plaintiff filed an unsolicited sur-reply attaching additional evidence purporting to show that Plaintiff was owed a commission on the Exempla, Providence Oregon, and Christus deals.  *See* Docket No. 34.  These materials are not properly before the court.  *See* Civil L.R. 7-3(d) ("Once a reply is filed, no additional memoranda, papers, or letters may be filed without prior Court approval" except in circumstances inapplicable here).

[7] Plaintiff cites only Joint Statement of Undisputed Material Fact ("JSUMF") 9 ("Plaintiff alleges he was owed unpaid commissions on the following deals: Banner Health, Providence Oregon, Providence SoCal, Exempla, Christus, Texas Health Resources."); JSUMF 66 ("At the time of Plaintiff's termination, the Hawaii Pacific deal had not closed."); JSUMF 67 ("At the time of Plaintiff's termination, the Providence SoCal deal had not closed, in part because not all the information requested by the client had been provided."); and JSUMF 71 ("Approximately one year after Plaintiff's termination, Medicity entered into a fixed fee agreement with ACS for the services it would provide to Banner.").  None of these facts supports Plaintiff's claim that he was owed commissions on particular deals prior to his termination.

[8] A year after Plaintiff was terminated, the Medicity deal was restructured into a fixed fee arrangement wherein Medicity received a fixed payment of $8.8 million from Banner Health.  JSUMF 71; Keane Decl. Ex. J (Medicity Statement of Work for Banner Health Network) at D000402-03.  However, Plaintiff does not argue that he was entitled to a commission on the basis of this payment.

17

**2. Implied Terms**

Plaintiff offers a second theory for breach of contract: Defendants' failure to pay a commission on the Banner Health deal breached implied terms to the contract.[9]

"Under limited circumstances, the court may find that a contract includes an implied term or covenant." *Ben-Zvi*, 40 Cal.App.4th at 473. "To effectuate the intent of the parties, implied covenants will be found if after examining the contract as a whole it is so obvious that the parties had no reason to state the covenant, the implication arises from the language of the agreement, and there is a legal necessity." *Id.* (citing *College Block v. Atlantic Richfield Co.*, 206 Cal.App.3d 1376, 1380 (1988)). "A contract term will be implied only where the term is 'indispensable to effectuate the expressed intention of the parties.'" *Id.* (citing *Lippman v. Sears, Roebuck & Co.*, 44 Cal.2d 136, 145 (1955)). "A term can only be implied upon grounds of obvious necessity." *Id.*

Setting aside the general disinclination to read implied terms into a contract when the express terms are clear, *see* Cal. Civ. Code § 1638, even if the court considers Plaintiff's arguments, it finds that there are no genuine issues of material fact such that a reasonable juror could conclude that Defendants breached any implied terms to the contract.

Plaintiff does not specify what terms were implied but seems to be suggesting that it was implied in the contract that "shared savings" deals would be paid based on the "book value" of the deal.[10] Plaintiff admits that nothing in the EAVP Plan plan states that a "shared savings deal" would be valued based on "book value." Plaintiff makes no argument and cites to no evidence that the Banner Health deal was to be paid based on the deal's "book value" (a term that Plaintiff never defines) rather that following the conditions outlined in the EAVP Plan. Without evidence, a reasonable jury cannot conclude that the contract should be read to permit commissions based on "book value" for shared savings deals, rather than upon Medicity's receipt of payment from Banner

---

[9]  The court notes that in his briefing, Plaintiff uses the term "implied contract" in passing, but provides no actual legal analysis of a claim for breach of implied contract.

[10] Plaintiff alleges in the FAC (but does not specifically argue in his opposition) that, despite the express terms of the contract, commissions for the Banner Health deal were to be paid on the basis of that deal's so-called "book value." FAC at ¶¶ 14, 25.

Health.

Even assuming that the contract should be interpreted as Plaintiff suggests, Plaintiff has almost no evidence to support that, prior to his termination, the Banner Health deal had a "book value" to use as a basis for paying Plaintiff a commission.  The only evidence to which Plaintiff points are two emails in the same thread sent by Brent Dover to Plaintiff and others on February 6 and 7, 2012, *before* the Banner Health deal closed on May 10, 2012.  *See* Opp. [Docket No. 30] at 17.  The emails have the subject heading, "Banner Executed LOI [Letter of Interest]."  Peters Decl. Ex. J.  In the February 6 email, Dover stated, "Here is the LOI that has been executed by Banner. I have no idea if these are the actual numbers that will be carried forward and counted towards Medicity or not—we will just have to wait and see. This will give us insight into what the client is thinking/expecting."  Peters Decl. Ex. J.  In the February 7 email, Dover states:

> For several reasons, for our monthly report I would like to show Banner as in Contract Negotiations and at a TCV of $13M for Medicity (the approximate value of the Exhibit in the LOI that was signed yesterday).
>
> I have serious doubts about if that is the correct value or not—but let's use that information to continue to press for an answer.
>
> Andrew-please make these changes in the monthly report. I think we currently show Banner in Best of Few at $5M. Paula-can you please make the change to Negotiating and $13M in SalesForce.com.

Peters Decl. Ex. J.  From the face of these documents, it is clear that they do not support Plaintiff's argument.  First, they refer to valuations of a prospective deal for purposes of a letter of interest.  Second, Dover explicitly states that he has "no idea if these are the actual numbers" and has "serious doubts about if that is the correct value" for the deal.  Upon this weak showing, a jury could not reasonably conclude that the Banner Health deal had been given a "book value" prior to Plaintiff's termination.

### 3. Miller's Statements About Paying A Commission

Finally, Plaintiff argues that Miller told Plaintiff on August 2, 2012 that Plaintiff "would be getting paid on the Banner deal." *See* Opp. at 17.  Plaintiff does not explain the significance of this statement vis-a-vis his breach of contract claim either in the FAC or in his opposition.  "On a motion

19

for summary judgment, the plaintiff's allegations and theories of liability are confined to those found in the operative complaint." *See Maples v. SolarWinds, Inc.*, No. C 12-6066 SBA, -- F.Supp. 2d --, 2014 WL 2860848 at *8 (N.D. Cal. June 23, 2014) (citing *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1292 (9th Cir. 2000) ("A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.")). It is improper for the court to invent a theory of liability for Plaintiff that Plaintiff himself failed to present, e.g., whether Miller's statements constituted an oral modification to the commission plans, with the result that Plaintiff had actually earned the Banner Health commission prior to his termination.[11] *See Williams v. Cnty. of Alameda*, No. C 12-02511 SBA, -- F.Supp.2d --, 2014 WL 556008 at * 12 (N.D. Cal. Feb. 10, 2014) ("This Court only considers arguments that are specifically and distinctively raised by the parties in their briefs.") (citing *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003)).

**B. Breach of Implied Covenant of Good Faith and Fair Dealing**

Defendants next move for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

Every contract possesses an implied covenant of good faith and fair dealing in which "neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 684 (1988). The scope of conduct prohibited by the implied covenant depends on the purposes and express terms of the contract. *Carma Developers, Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 373 (1992). "[A]s a general matter, implied terms should never be read to vary express terms" of a contract. *Id.* at 374. *See also Tollefson v. Roman Catholic Bishop*, 219 Cal.App.3d 843, 853-854 (1990) (the covenant of good faith and fair dealing "cannot be used to imply an obligation which would completely obliterate a right expressly provided by a written contract") (disapproved on other grounds in *Scott v. Pacific Gas & Electric Co.*, 11 Cal.4th 454, 474 n. 5 (1995)). "Although breach

---

[11] The court notes, however, that such an argument would be contrary to Plaintiff's concession at oral argument that he had not earned a commission on the Banner Health deal prior to his termination.

of the implied covenant often is pleaded as a separate count, a breach of the implied covenant is necessarily a breach of contract." *Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal. App. 4th 873, 885 (2011).

The primary basis for Plaintiff's claim is that the implied covenant prohibits Defendants from terminating his employment in order to avoid paying Plaintiff the commissions he was owed. However, as discussed above, no reasonable juror could find that Plaintiff had earned commissions under either the ERVP or EAVP Plans at the time of his termination.  Indeed, the evidence supports that only one deal – Banner Health – was closed before Plaintiff's termination.  At oral argument, Plaintiff conceded that even though Banner Health had signed a contract, Plaintiff had not earned a commission on the Banner Health deal while he was employed with Medicity pursuant to the terms of the ERVP and EAVP commission plans.  The only evidence in the record regarding client payments on that deal indicate that Banner Health did not make any payments to Medicity until a year after Plaintiff was terminated.  The covenant of good faith may not "be read to prohibit a party from doing that which is expressly permitted by an agreement." *Carma Developers, Inc.,* 2 Cal.4th at 374.  Under the terms of the ERVP and EAVP commission plans, Plaintiff was not entitled to a commission on a deal that had not resulted in a payment to Medicity while Plaintiff was employed. Thus, Defendants cannot be held liable for breach of the implied covenant of good faith and fair dealing for doing what Defendants were expressly permitted to do by the terms of the ERVP and EAVP: refuse to pay Plaintiff a commission for which Medicity did not receive payment until a year after Plaintiff left Medicity's employment.

Plaintiff offers a second theory for this claim: the implied covenant prohibits employers from terminating employees to avoid paying commissions the employee "would be earning shortly thereafter."  The only case cited by Plaintiff  in support of this argument is *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 318 (2000).  In *Guz*, the plaintiff was laid off when his work unit was eliminated.  The plaintiff sued his former employer, among other things, for age discrimination and breach of the implied covenant of good faith and fair dealing.  The plaintiff claimed that the implied covenant precluded the defendants from "terminating him arbitrarily, as by failing to follow its own policies,

or in bad faith." *Id.* at 326-27.  The California Supreme Court found that the trial court properly

dismissed the plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  The

court first noted that an implied covenant could not impose substantive duties on contracting parties

beyond those incorporated into the specific terms of their agreement.  "If an employment is at will,

and thus allows either party to terminate for *any or no* reason, the implied covenant cannot decree

otherwise." *Id.* at 327 (emphasis in original).  Thus, the court concluded that "if the employer's

termination decisions, however arbitrary, do not breach such a substantive contract provision, they

are not precluded by the covenant . . . . [A] breach of the implied covenant cannot logically be based

on a claim that the discharge of an at-will employee was made without good cause." *Id.* (citation

and brackets omitted).

     In dicta, the *Guz* court stated, "We do not suggest the covenant of good faith and fair dealing

has no function whatever in the interpretation and enforcement of employment contracts." *Id.* at

353, n. 18 (emphasis added).  The court described one scenario that could give rise to a claim for

breach of the covenant of good faith and fair dealing:

> [T]he covenant prevents a party from acting in bad faith to frustrate the contract's actual benefits.  **Thus, for example, the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned.**

*Id.*

     Plaintiff argues that the emphasized language quoted from *Guz* supports his theory that the

implied covenant prohibits an employer from terminating an employee to avoid paying a

commission he "would be earning shortly."  The language in *Guz* does not support this argument.

*Guz* states that the implied covenant might be violated if the termination is aimed at cheating the

employee out of "compensation *already earned.*"  *Guz* does not suggest that the implied covenant

theory can be stretched to cover situations where an employee is terminated, and is not able to

collect commissions that are prospective and not yet earned.  *Accord Remus v. Fios, Inc.*, No. C 11-

01264 CRB, 2012 WL 707477 at *9 (N.D. Cal. Mar. 5, 2012) (granting summary judgment against

plaintiff on implied covenant claim, where plaintiff salesman argued that defendant's decision to

change commission rate for a commission that had not yet been earned frustrated plaintiff's expectation for amount of the prospective commission, because "[t]o read the Compensation Plan as implying that the covenant of good faith and fair dealing prevented Defendant from taking away prospective commissions is in direct conflict with the stated language of the Compensation Plan") (quotation omitted).  Indeed, to permit an implied covenant claim on Plaintiff's theory would be to effectively limit an employer's right to fire an at-will employee simply because there was an indefinite prospect of a commission in the future.

Although Plaintiff cited only *Guz*, the court, conducting its own research, has found at least one case in which a court denied summary judgment on an implied covenant claim where there was sufficient evidence to show that an employee had been terminated in order to avoid paying her a future commission.  *McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1155 (N.D. Cal. 2002).  In *McCollum*, which relied upon *Guz,* the plaintiff submitted sufficient evidence to show that the defendant had terminated the plaintiff in order to avoid paying her a $570,130 commission on an imminent $10 million deal that was signed one week after plaintiff was terminated.  *Id.  McCollum* is factually distinguished from the instant case because the plaintiff in *McCollum* raised triable issues on her related breach of contract cause of action as to whether she had in fact *earned* the anticipated commission.[12]  Here, as discussed above, no reasonable juror could find that Plaintiff earned the Banner Health commissions, especially in light of the fact that his counsel repeatedly conceded that Plaintiff had *not* earned commissions on that deal at the time of his termination.

Accordingly, the court finds that there is no genuine issue of material fact as to whether

---

[12]  McCollum's compensation plan included a provision under which she would forfeit any undisbursed commissions if she resigned; there was a fact dispute over whether McCollum resigned or was terminated.  *Id.* at 1147.  McCollum also raised a triable issue of fact as to whether a different provision in her compensation plan, which allowed her employer to remove her from an account at its discretion, was unconscionable.  *Id.* at 1152.

In addition, the wages to be paid to the *McCollum* plaintiff were more ascertainable than they are here: the commission to be paid in *McCollum* was a fixed-fee arrangement that was scheduled to be signed days *before* the plaintiff was terminated (although due to unexplained delays it was ultimately signed one week afterward), whereas the Banner Health deal was a shared savings arrangement that may not have ever led to a commission.

Defendants violated the covenant of good faith and fair dealing, and grants Defendants' summary judgment motion on that claim.

## C.  California Labor Code § 203 Claim

California Labor Code § 203 imposes penalties on employers who willfully fail to pay "any wages of an employee who is discharged."  Cal. Labor Code § 203(a).  Plaintiff argues that Defendants violated this statute by failing to pay Plaintiff the commissions he was due.  For the reasons stated above, no reasonable factfinder could conclude that Plaintiff had earned the wages he claims he is due.  Accordingly, summary judgment is granted against Plaintiff on the Section 203 claim.

## D.  California Labor Code § 232 Claim

Defendants move for summary judgment on Plaintiff's claim for violation of California Labor Code § 232.  However, at the hearing, Plaintiff's counsel voluntarily withdrew the claim, to which Defendants did not object.  Accordingly, the summary judgment motion as to this claim is denied as moot.  *See Maples*, 2014 WL 2860848 at *9 ("The proper course of action is to construe [a] voluntary withdrawal as a motion to amend under Federal Rule of Civil Procedure 15(a)" and grant that motion if it is unopposed) (citing *Hells Canyon Preservation Council v. U.S. Forest Serv.,* 403 F.3d 683, 689 (9th Cir. 2005)).

## E.  Claim for Wrongful Discharge In Violation of Public Policy (*Tameny* Claim)

Plaintiff argues that his termination for alleged misconduct was actually motivated by Defendants' desire to avoid paying Plaintiff for the commissions he had earned.  Opp. at 15. Plaintiff alleges that this conduct constitutes a wrongful discharge in violation of public policy. Medicity contends he was terminated due to a history of unsatisfactory performance and inappropriate behavior.

### 1.  Legal Standard

Under California law, "[a]n at-will employment may be ended by either party at any time without cause, for any or no reason, and subject to no procedure except the statutory requirement of notice."  *Guz*, 24 Cal. 4th at 335.  *See also* Cal. Labor Code § 2922 ("An employment, having no

specified term, may be terminated at the will of either party on notice to the other.").  However, "an exception to the employment at-will doctrine is recognized where the employee's termination was the result of a violation of the fundamental principles of public policy."  *Stoval v. Basin St. Properties*, No. 12-CV-04661-JST, 2013 WL 6002758 at *3 (N.D. Cal. Nov. 12, 2013) (citing *Tameny v. Atl. Richfield Co.,* 27 Cal.3d 167, 170 (1980)).  In such cases, "the discharged employee may maintain a tort action and recover damages traditionally available in such actions."  *Tameny*, 27 Cal.3d at 170.

To prevail on a claim for wrongful discharge in violation of public policy, sometimes referred to as a *Tameny* claim, a plaintiff must establish that (1) an employer-employee relationship existed; (2) plaintiff's employment was terminated; (3) the violation of public policy was a motivating reason for the termination; and (4) the termination was the cause of plaintiff's damages.  *Haney v. Aramark Unif. Servs., Inc.,* 121 Cal.App. 4th 623, 641 (2004).  The "public policy" underlying the claim must be (1) supported by either constitutional or statutory provisions; (2) "public" in the sense that it "inures to the benefit of the public" rather than merely serving the interests of individuals; (3) well-established at the time of plaintiff's discharge; and (4) "fundamental" and "substantial."  *Stevenson v.Super. Ct.,* 16 Cal.4th 880, 889-90 (1997).

### 2. Violation of Public Policy

In the FAC, Plaintiff specifically identifies two statutes that purportedly express the "public policy" underlying this claim: California Labor Code §§ 232 and 232.5.  FAC at ¶ 48.  However, Plaintiff appears to have abandoned the argument that these two statutes supply the public policy underpinning for his *Tameny* claim, as he does not discuss them in his opposition brief.

In fact, Plaintiff's opposition never clearly articulates the fundamental public policy upon which he bases this claim, and instead focuses on the constellation of facts relevant to the issue of pretext.  However, the court cannot reach the question of pretext without first determining whether there was an alleged violation of a fundamental, well-established public policy, grounded in a California statute or constitutional provision.  Plaintiff appears to rely on the public policy articulated in *Gould v. Maryland Sound Industries, Inc.*, 31 Cal.App.4th 1137 (1995).  In *Gould*, the

California Court of Appeal pointed to California Labor Code Sections 201, 202 and 216 in support of its holding that "the prompt payment of wages due an employee is a fundamental public policy."[13] 31 Cal.App.4th at 1147.  Thus, a plaintiff states a claim for wrongful discharge when he alleges that his employer discharged him "in order to avoid paying him the commissions . . . and other amounts he had earned, [thereby violating] a fundamental public policy of this state." *Id.* at 31 Cal.App.4th at 1148.

There are few cases considering this aspect of the *Gould* decision, but at least some courts have cited to *Gould* to permit *Tameny* claims alleging that the employer terminated the employee to avoid paying earned commissions.  *See, e.g., Lim v. Prudential Ins. Co. of Am.*, No. 00-56403, 36 F. App'x 267, 269-70 (9th Cir. May 17, 2002) (following *Gould* and finding that plaintiff stated a *Tameny* claim by alleging that defendant terminated her employment "in order to avoid paying her commissions she earned in the course of her work as an insurance representative"; noting also that "*Gould* is a state court of appeal decision rather than a California Supreme Court decision . . . . We note, however, that the question whether *Gould* accurately states the law of California might best be left to the California courts to decide").

*Gould* stands for the proposition that firing an employee in order to avoid paying him the commissions he has earned violates a fundamental public policy of California, and thus supports a wrongful discharge claim.  At least one court arguably has interpreted *Gould* to permit a wrongful discharge claim where the plaintiff alleges that his employer terminated him in order to avoid paying prospective commissions.  *See McCollum*, 212 F. Supp. 2d at 1155.  But as discussed above, *McCollum* is factually distinguishable from this case, as there were triable issues of fact regarding whether the plaintiff had in fact *earned* the commissions in dispute.

In this way, *McCollum* is consistent with *Remus.*  There, the plaintiff did not dispute that he had been paid all commissions earned at the time of his termination.  *Remus*, 2012 WL 707477 at

---

[13]   These statutes require an employer to pay an employee's "earned but unpaid wages" or "wages . . . due" promptly upon the employee's termination or resignation, and penalize employers who have the ability to pay "wages due and payable" but refuse to pay after a demand has been made.  *See* Cal. Labor Code §§ 201, 202, 216.

*10. Instead, he complained that he had been "deprived of commissions based on anticipated but uncommitted future business from Intel—essentially *future* commissions that were *unearned* at the time of termination." *Id.* (emphasis in original). The plaintiff brought a *Tameny* claim on the basis that his employer's "primary motivation for terminating [his] employment was to prevent [him] from receiving any commission from the Intel contract to which he was entitled as well as retaliation due to his complaining concerning the compensation decisions made by the defendant." *Id.* at *9. The court noted that *Gould* "support[s] the general proposition that the prompt payment of *wages due* is a fundamental public policy" but found "no legal authority that would support [the] claim that complaining about future modification to his work assignment or the loss of future wages constitutes protected activity . . . ." *Id.* at *10-11 (emphasis added). Because "[t]here is no statute or constitutional provision that deems complaints about changes to prospective, unearned wa[g]es to be protected activity," the court found that the plaintiff "failed to demonstrate [that] he engaged in a protected activity" and entered summary judgment against him. *Id.* at *11. *See also Sinclair v. Servicemaster Co.*, No. CIV 07-0611 FCD/DAD, 2007 WL 2254448 at *4 (E.D. Cal. Aug. 3, 2007) ("California public policy does not prohibit termination of employees in order to avoid paying *future* wages not yet earned. Thus, plaintiff's allegation that defendant terminated his employment in order to avoid paying any future wages or compensation due fails to state a claim for wrongful termination in violation of public policy"; denying *Tameny* claim based on plaintiff's claim that employer terminated him in order to avoid future award of restricted stock).

Plaintiff cites to two cases that ostensibly support his reading of *Gould*, but neither confirm that firing an at-will employee in order to avoid paying as yet unearned wages violates established California public policy. In *Kelly v. Stamps.com Inc.*, 135 Cal.App.4th 1088 (2005), the plaintiff was seven months pregnant when she was terminated two months before her planned maternity leave. Her termination also came two months prior to planned bonus she had been promised months before. *Id.* at 1091. The court held that there was a triable issue of fact regarding whether plaintiff's termination had been a discriminatory discharge on the basis of pregnancy. *Id.* at 1102. The plaintiff had also brought a *Tameny* claim alleging that the defendant had terminated her in order to

27

avoid paying her a bonus, in violation of the "fundamental public policy entitling employees to prompt payment of wages due." *Id.* at 1104.  The trial court granting summary judgment in favor of the defendant, but did not specifically discuss this claim.  *Id.*  The defendant's only argument on this claim on appeal was that plaintiff was not entitled to her bonus.  Rejecting this argument, the California Court of Appeal noted that if the defendant was found to have terminated the plaintiff for discriminatory reasons, the plaintiff might have been entitled to the bonus, and reversed the trial court's decision.  *Id.*  Thus, as with *McCollum*, there were disputed facts as to whether the *Kelly* plaintiff had actually earned the bonus.

Finally, Plaintiff cites *Costanza v. Simon Equipment Co., Inc.*, No. B177455, 2006 WL 2349594 (Cal. Ct. App. Aug. 29, 2006).  In *Costanza*, the plaintiff was a shareholder and senior executive for the defendant, a closely held corporation.  The plaintiff contended that the other shareholders had "breached their fiduciary duties by terminating her employment and denying her a bonus, since she had a right, as a shareholder, to employment and bonuses as a return on her investment in the [corporation]." *Id.* at *16.  The court held that the plaintiff had failed to raise a triable issue of fact for her breach of fiduciary duty claim because the corporation "had no formal bonus policies . . . . [and instead] the directors had complete discretion to determine whether and how much each employee should receive . . . ." *Id.* at *17.  In that context, the court noted that "[t]he fact that [the plaintiff] was terminated days before the end of the fiscal year raises a suspicion that the action was taken to avoid payment of a substantial bonus.  Nonetheless, the decision is protected by the business judgment rule.  It was reasonable for the directors to decide not to award a bonus to Leann after she engaged in activities harmful to the Company." *Id.* at *17.  Thus *Costanza* does not support Plaintiff's argument regarding wrongful discharge because the claim at issue in *Costanza* was a breach of fiduciary duty claim, and in any event, the fact that the termination of employment raised the suspicion that it was taken to avoid payment of the bonus ultimately did not preclude summary judgment on that claim.

The public policy underlying a Tameny claim must be "well-established at the time of plaintiff's discharge." *Stevenson*, 16 Cal.4th at 890.  Plaintiff has conceded that he had not earned

the Banner Health commissions at the time of his termination.  California public policy does not

clearly prohibit termination of employees in order to avoid paying future commissions not yet

earned.  For these reasons, the court grants summary judgment in favor of Defendants on the

Tameny claim.

**F.  Libel and Slander Claims**

Plaintiff alleges that Miller's written and oral communications to other Medicity employees

about his belief that Plaintiff had shared internal sales information with a competitor constitute libel

and slander.  The communications forming the basis of Plaintiff's defamation claims are as follows:

> 1.    Miller's November 5, 2012 email to two Medicity management employees.
> 2.    Miller's November 5, 2012 email to two Aetna Human Resources employees.
> 3.    Miller's spoken communication to Hayward.
> 4.    Miller's spoken communication to House and other Medicity sales employees.

Opp. at 23-24.  The details of these communications are described above in Section I.F.

"Defamation constitutes an injury to reputation; the injury may occur by means of libel or

slander."  *Shively v. Bozanich*, 31 Cal. 4th 1230, 1242 (2003) (citing Cal. Civ. Code § 44).  "In

general . . . a written communication that is false, that is not protected by any privilege, and that

exposes a person to contempt or ridicule or certain other reputational injuries, constitutes libel."  *Id.*

(citing Cal. Civ. Code, § 45; Rest.2d Torts, § 568(1)).  "A false and unprivileged *oral*

communication attributing to a person specific misdeeds or certain unfavorable characteristics or

qualities, or uttering certain other derogatory statements regarding a person, constitutes slander. "

*Id.* at 682-83 (citing Cal. Civ. Code § 46; Rest.2d Torts, § 568(2)).  The present case involves

defamation claims based upon both libel and slander.

To constitute defamation, a communication must be "unprivileged."  Cal. Civ. Code §§ 45,

46.  Defendants argue that the common interest privilege, codified at California Civil Code § 47(c),

protects the statements that Miller made to Medicity staff, because the statements were reasonably

calculated to protect Defendants' sales information.

California Civil Code § 47(c) grants a conditional privilege against defamation to

communications made without malice on subjects of mutual interest.  A privileged publication is

1  made "without malice, to a person interested therein, (1) by one who is also interested, or (2) by one

2  who stands in such a relation to the person interested as to afford a reasonable ground for supposing

3  the motive for the communication to be innocent, or (3) who is requested by the person interested to

4  give the information." Cal. Civ. Code § 47(c). While defendants have the burden of proving that an

5  allegedly defamatory statement falls within the scope of the common interest privilege, plaintiffs

6  have the burden of proving that the statement was made with malice. *Lundquist v. Reusser*, 7

7  Cal.4th 1193, 1203 (1994).

8  **1. Common Interest**

9  With respect to the requirement that the communication be made between people with a

10  shared or common interest, "[c]ommunications made in a commercial setting relating to the conduct

11  of an employee have been held to fall squarely within the qualified privilege for communications to

12  interested persons." *Cuenca v. Safeway San Francisco Employees Fed. Credit Union*, 180

13  Cal.App.3d 985, 996 (1986). In *Cuenca*, oral and written statements made by the supervisory

14  committee of the defendant credit union to the board of directors about its suspicions that the

15  plaintiff, an employee in the credit union, took kickbacks and spent much of his work time on

16  outside matters were privileged under Section 47(c). *Id.* at 991, 996. The written statements were

17  made in a report marked "Absolutely Personal and Confidential" and were distributed only to

18  members of the supervisory committee and the board of directors. The appellate court upheld the

19  trial court's summary judgment decision finding the statements conditionally privileged, noting that

20  the statements were "directly relevant to plaintiff's fitness as manager of the Credit Union and as

21  such were matters of direct interest to the Credit Union's supervisory committee, its auditor, and its

22  board of directors." *Id.* at 996.

23  Here, the undisputed facts show that the communications at issue were made by Miller,

24  Plaintiff's former supervisor, to (1) two Medicity management employees, (2) two Aetna Human

25  Resources employees, (3) Plaintiff's supervisor, and (4) to Steve House and other Medicity

26  salespeople on a sales conference call. This is not, as Plaintiff contends, "reckless publication to a

27  wide range of people." Opp. at 25. Instead, these recipients shared Miller's interest in protecting

28  30

Medicity's sales pipeline and other economic interests, and ensuring that Medicity sales employees followed the company's policies.  The statements were also limited in scope—they were short statements about Miller's suspicion that Plaintiff had shared Medicity's pipeline with a competitor and the bases of Miller's belief, rather than broader statements about Plaintiff's work performance. To the extent Miller stated that Plaintiff had a "vindictive" personality, he did so in the context of explaining why he felt it was plausible that Plaintiff would share Medicity's information.

Plaintiff's only argument against a finding of common interest between these individuals is that *Cuenca* stands for the proposition that only high-ranking employees share a common interest in an employee's performance, and information about that performance must be shared in a limited, confidential medium.  However, case law is to the contrary.  In fact, employers may share a common interest in an employee's or former employee's performance with not only a supervisory committee or board of directors, but also with other employees in the same company or even third parties, and even outside of the context of confidential management meetings.  In *Deaile v. General Telephone Co.*, 40 Cal.App.3d 841, 845 (1974), the plaintiff was formerly employed as the chief operator of a telephone company.  Her former employer told not only management personnel but also other operators that the plaintiff had been forced into retirement because she had used sick leave to take vacation time.  The court found these statements to be "clearly privileged."  *Id.* at 847.  "Clearly, an employer is privileged in pursuing its own economic interests and that of its employees to ascertain whether an employee has breached his responsibilities of employment and if so, to communicate, in good faith, that fact to others within its employ so that (1) appropriate action may be taken against the employee; (2) the danger of such breaches occurring in the future may be minimized; and (3) present employees may not develop misconceptions that affect their employment with respect to certain conduct that was undertaken in the past."  *Id.* at 849.  *See also Williams v. Taylor*, 129 Cal.App.3d 745, 751-52 (1982) (statements about theft by and dishonesty of a former employee made by an officer and a manager of an auto body shop to insurance adjusters who referred business to the shop were protected by conditional privilege, because speakers and insurance adjusters had common commercial interests in their business-customer relationship).

1

**2.  Malice**

Because Defendants have met their burden of showing that the allegedly defamatory statements fall within the scope of the common interest privilege, the burden shifts to Plaintiff to prove that the statements were made with malice.  *Lundquist*, 7 Cal.4th at 1203.

The malice necessary to defeat an assertion of qualified privilege is "actual malice," which may be established in two ways: "[1] by a showing that the publication was motivated by hatred or ill will towards the plaintiff or [2] by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights."  *Sanborn v. Chronicle Pub. Co.*, 18 Cal. 3d 406, 413 (1976) (citation omitted).  *See also Rollenhagen v. City of Orange*, 116 Cal.App.3d 414, 424 (1981) ("'[A]ctual malice' has been defined as one made with knowledge that it was false or with a reckless disregard of whether it was false or not.") (citations omitted); *Cuenca*, 180 Cal.App.3d at 997.

Plaintiff does not assert the existence of the first kind of actual malice, and instead argues the second, namely, that Miller acted with reckless disregard because he lacked a reasonable basis for his statements.  Opp. at 25.  When a plaintiff fails to raise triable issues of fact regarding whether a defendant acted with reckless disregard, a court may grant summary judgment in favor of the defendant as a matter of law.  *See McGrory v. Applied Signal Technology, Inc.*, 212 Cal.App.4th 150, 1541 (2013) (granting summary judgment for employer on employee's defamation claim, where employee failed present evidence "giving rise to a reasonable inference either that [the employer] did not believe it when he said [it] or that [the employer's] belief was unreasonable"); *Cuenca*, 180 Cal.App.3d at 998-1000 (granting summary judgment for employer on employee's defamation claim, where the evidence raised by the employee did not suggest that employer was "repeating [statements] without a reasonable belief in their truth" and therefore did not raise a triable issue of fact as to reckless disregard); *Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1202-03 (9th Cir. 2001) (reversing district court's grant of summary judgment for defendant on defamation claim, where district court "did not specifically address the reckless disregard issue" and plaintiff came forward with evidence that created a triable issue on reckless disregard).

The bases for Plaintiff's argument that Miller acted with reckless disregard in making the disputed statements are that (1) Miller lacked a factual basis for making his statements; (2) Miller traced the termination email that he sent to Plaintiff;[14] (3) Miller's statements affected Plaintiff's reputation, which is especially important to workers in the sales industry; and (4) Miller failed to investigate the statement allegedly made by Bowes.

With respect to Plaintiff's first contention, the evidence (and the statements themselves) show that Miller did have a factual basis for the statements. Miller testified that the basis for his statements was information that his ex-wife had received from a former Medicity employee, Dawn Bowes, who stated that she was going to "going to cause some serious harm to Medicity." Shortly thereafter, the former employee unexpectedly showed up at two deals being pursued by Medicity. Miller noted that the two deals were accounts in which Plaintiff had been previously involved and were also the two clients that "most recently [had] asked that [Plaintiff] be removed from their account." JSUMF 96. These facts provide a reasonable basis for Miller's statements about Plaintiff. In addition, with respect to the two November 5, 2012 emails, Miller qualified his belief by noting that he "only [has] circumstantial evidence" and a "gut feel" based on the information he had received "over the weekend." JSUMF 95, 96.

Next, Plaintiff does not explain how Miller's tracing of the termination email amounts to malice for purposes of the conditional privilege. The inquiry requires the court to consider evidence not of Miller's general suspicion of Plaintiff, but specifically of Miller's reckless disregard for the truth or falsity of his statements. That Miller traced the termination email does not lead to the inference that Miller did not have a reasonable belief that the statements he made about Plaintiff having shared Medicity's pipeline with a competitor were true. Likewise, the fact that Miller's

---

[14]  Miller used an email tracking service to confirm that Plaintiff received and opened the October 2, 2012 email terminating his employment. The service also produced an email receipt showing that Plaintiff had forwarded his termination email from Miller to "KEMNITZER ANDERSON." Miller received this email receipt. Based on the email receipt, Miller concluded that Pashman had forwarded the termination email to a law firm called Kemnitzer Barron & Krief LLP in San Francisco. Miller sent emails to Getz, Brent Dover, and other Medicity Human Resources employees stating the same.

The court notes that Plaintiff did not raise this argument regarding defamation in his Opposition, but instead did so during the hearing.

33

1  statements attack an important asset for a salesperson—i.e., the salesperson's reputation—is

2  unconnected with Miller's subjective belief in or reckless disregard for the truth or falsity of his

3  statements.

4        Finally, Plaintiff argues that Miller's failure to investigate the statement allegedly made by

5  Bowes amounts to reckless disregard.  However, while "a lack of inquiry and investigation may

6  supply the sufficient inference of lack of good faith or negligence sufficient to supply the element of

7  malice" in light of all of the relevant evidence, mere failure to inquire "cannot constitute lack of

8  reasonable or probable cause" to believe in the truth of the publication.  *Rollenhagen*, 116

9  Cal.App.3d at 423.  *See also Vackar v. Package Machinery Co.*, 841 F.Supp. 310, 314 (N.D. Cal.

10  1993) ("Mere negligence in investigating the truth of the allegedly defamatory statements is

11  insufficient to establish malice.").

12        Because Miller's statements were made to other Medicity employees who shared Miller's

13  interest in protecting Medicity's sales pipeline and policies, and because Plaintiff has failed to raise

14  triable issues of fact regarding whether Miller acted with malice, the common interest privilege in

15  Section 47(c) applies.  Privileged statements are not defamatory.  Summary judgment is granted for

16  Defendants on the libel and slander claims.[15]

17  **IV.  CONCLUSION**

18        For the foregoing reasons, the motion for summary judgment is **granted**.

19

20        IT IS SO ORDERED.

21

22

23  Dated:  July 18, 2014



24                        DONNA M. RYU

                      United States Magistrate Judge

25

26        [15]  Because the conditional privilege applies, the court declines to consider Defendants' other
arguments against the defamation claims, namely, that the statements Miller made were non-actionable

27  opinion or were substantially true.

28